

**In The**
**Court of Appeals**
**Sixth Appellate District of Texas at Texarkana**

_____

No. 06-11-00110-CV
_____

RONALD M. BENDALIN, Appellant

V.

YOUNGBLOOD & ASSOCIATES, A TEXAS GENERAL PARTNERSHIP, ELDON L.
YOUNGBLOOD, HILARY YOUNGBLOOD, AND DAVID PEDERSON, Appellees

---

On Appeal from the 14th Judicial District Court
Dallas County, Texas
Trial Court No. 09-04486

---

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Chief Justice Morriss

O P I N I O N

In its simplest terms, the withdrawal of Ronald M. Bendalin from his law partnership with Eldon L. Youngblood gave rise to this dispute involving the two men and their entities, most notably the Youngblood and Bendalin Partnership (YB Partnership). The relationships involved and the fallout from the withdrawal, however, are far from simple.

A bench trial in Dallas County[1] yielded a judgment against Bendalin for wrongful withdrawal as a partner. He was ordered to pay, *inter alia*, $43,831.00 as his exiting partnership contribution, $5,259.72 and $1,413.16 as prejudgment interest, $295,817.50 in attorney's fees, and $69,563.85 in expert fees.[2] We reverse the trial court's judgment and remand for further proceedings consistent with this opinion, because we reach the following conclusions:

1. Bendalin's withdrawal was effective without written notice;
2. Bendalin's attempts to rescind his withdrawal were ineffective;
3. Quasi-estoppel does not negate Bendalin's withdrawal;
4. Bendalin's withdrawal was effective December 31, 2008;
5. Bendalin's withdrawal was not wrongful; and
6. Remand is needed to determine the amounts to be recovered.

Because of the complexity of this matter, we have structured this opinion in multiple parts, including our analysis leading to the above six holdings.

---

[1]Originally appealed to the Fifth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2005). Except as expressly recognized in this opinion—wherein we use precedent from the Fifth Court—we are unaware of any conflict between precedent of the Fifth Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

[2]The court also unconditionally awarded "an additional $75,000.00 for additional services that will be rendered in the event of an appeal by Defendant Bendalin to the Court of Appeals."

I.    BACKGROUND

A.    The Relationships

Youngblood was an attorney associated with Akin, Gump, Strauss, Hauer & Feld, LLP (Akin) in the 1990s.  He developed a practice "by which large volumes of residential mortgage loan-document packages could be prepared quickly and accurately, using sophisticated computer software and significant paralegal help."  A fixed fee was charged by Akin "to the lender-client's borrower and paid upon the closing of the loan."  The practice grew, and Youngblood caused Akin to hire Bendalin in 1999 as his associate.

In 2003, Youngblood and Bendalin "negotiated a buy-out from Akin of the practice" and together formed YB Partnership for the following purpose:

> The Partnership is formed to develop and perform legal services work in the nature of high-volume, fixed-fee preparation of residential loan and deed packages for institutions within the mortgage banking industry and to execute and deliver any documents or instruments necessary or appropriate in connection with the business of the Partnership, and for all other purposes appropriate or permitted for a legal services firm.

They also negotiated an arrangement with another law firm, McGlinchey Stafford PLLC (McGlinchey),[3] in which they would personally "become non-equity partners of McGlinchey and, McGlinchey would become a minority partner in a new entity as of July 1, 2003." McGlinchey was to receive a twenty percent carried continuing interest in the new entity in exchange for "something over a million dollars."  This new entity, formed by YB Partnership as the general partner and McGlinchey, was called McGlinchey Stafford and Youngblood &

---

[3]McGlinchey's managing partner and CEO was Rudy Aguilar.

3

Bendalin, LLP (Firm), and carried out the day-to-day business of a legal services firm. YB Partnership owned eighty percent interest in the Firm[4] and McGlinchey owned "20% through a wholly owned subsidiary called MB Member." Youngblood testified that subsequently, the Firm created a company called McGlinchey Stafford and Youngblood & Bendalin Mortgage Banking Group, LLC (MBG) so that MBG could "be the employer of . . . employees and lease them back to [the Firm] . . . and, of course, we continued [YB Partnership] to supervise those employees."[5]

Bendalin wore four hats as a result of the business structure outlined above. He was a nonequity partner and lawyer for McGlinchey, a partner of YB Partnership, the Firm's manager, and an MBG employee.

B.     The Withdrawal

According to the Firm's Chief Compliance and Document Preparation Director, Marshall Clayton Mahurin, III, the Firm was "continually growing" until 2007, when there was a "drastic reduction in the entire industry that impacted us directly and our loan volume dropped off precipitously, and I would estimate that we laid off approximately 50 percent of our workforce, possibly more." The financial impact of this decline in business was felt throughout 2008, and there was even a time when MBG employees were being asked to take unpaid time off in order to prevent layoffs.

---

[4]According to Bendalin, YB Partnership's assets were this eighty percent interest in the Firm, a certificate of deposit, and "[s]ome cash," including a line of credit at Northern Trust, which was secured by the $150,000.00 certificate of deposit.

[5]In 2005, McGlinchey was replaced with MSYB Member P.L.L.C. However, the testifying witnesses in this case continued to refer to McGlinchey as the Firm's twenty percent interest holder, even after 2005. To avoid confusion, this opinion will refer to McGlinchey only.

4

In the summer of 2008, Bendalin began representing Vantium Capital (Vantium) as one of McGlinchey's corporate clients, and was being paid for his legal services on an hourly basis. Appreciating his work, Vantium extended an offer of employment to Bendalin. On November 20, 2008, Bendalin signed a three-year general counsel employment contract with Vantium. He "owed it to his family to take the offer that was extended to him" for financial reasons, as it was "too good to refuse." Bendalin's start date was December 2, 2008, a fact not known by Youngblood "until discovery in the lawsuit."

On the morning of November 21, 2008, Bendalin held a private meeting with Youngblood to announce his departure, informing Youngblood "that he had accepted a full-time general counsel position with Vantium Capital, . . . that he was leaving the firm and intended to sell his interest either to [him] or to someone else." Youngblood testified that Bendalin's departure was unconditional and that he understood he would have "the first shot" to purchase the YB Partnership interest because "[t]hat's the only interest he had to sell and that was the interest—that was the entity he was withdrawing from." He testified that there was a discussion that McGlinchey might have been interested in purchasing Bendalin's interest in YB Partnership, in addition to individual potential purchasers Tom Turet and David John Pederson.

MBG Accounting Director and Director of Client Services (and YB Partnership's sole employee), Sandra Martin, also heard from Bendalin on November 21, 2008, who "said that he was leaving and taking a job with Vantium Capital." Martin "asked if there was any way he would reconsider. He said no." She "even asked if he—if we could work out him staying 'Of Counsel.' He said no."

5

Also in evidence is a "statement regarding withdrawal" signed by Youngblood and Murphy which said that they were in the meeting with Bendalin November 21, 2008, and that, during that meeting, "Bendalin expressed his will and intention to withdraw from the business and law partnership . . . and specified the effective date for his withdrawal to be December 31, 2008." No evidence directly contradicts this statement.

Also on November 21, Pederson, who had joined the Firm as an attorney, was asked by Bendalin to join him for "a quick beer right after work." Pederson testified that Bendalin "told me that he wanted to let me know that he was leaving the firm and taking a position as general counsel with Vantium Capital." Pederson "asked him if there was any way he would stay and he -- he indicated there -- it was a done deal, he couldn't -- he had to move on." Pederson and Murphy clarified that Bendalin did not specify whether he was withdrawing from the YB Partnership at these meetings. Murphy's attempts during the following week to convince Bendalin to stay were fruitless.

On December 1, 2008, the Firm "had a regular staff managers meeting . . . where the midlevel managers," of MBG, including Martin, Pederson, HR Director Cindy Wall, Dacia Owen, IT Director John Mezger, Customer Service/Help Line Director Ken Mezger, Marketing Director Vicki Murphy, Mahurin, Youngblood, and Bendalin all "came together." Pederson testified that Bendalin "simply announced to everyone that he would be leaving and taking the position of general counsel at Vantium Capital" "[a]t the end of the meeting" and that he would

be gone by December 31, 2008.[6]  Bendalin did not respond to a question posed by Martin as to whether a partnership could only have one partner.

After the meeting, Martin was asked to "come up with a list of issues that would need to be handled for [Bendalin] to be able to transition out of the business" by December 31, such as revising the company name, removing Bendalin from payroll, and potentially adding a new partner.  This list also included "Remove Bendalin from Bank Accounts: . . . YB Northern Trust," "Determine FMV[7] Model."

Murphy testified that Bendalin had "[v]ery little involvement with YB" or the Firm after December 1 and that he turned in his company Blackberry December 3.  In a December 5, 2008, e-mail, Youngblood sent the following note to Bendalin:

> Just a reminder:  Sandra M[artin] and I need a signed notice from you of your withdrawal from YB partnership to be effective December 31.  I also need your written consent to transfer a small portion (1%) of my interest to another unnamed person (probably David; my daughter, Hilary; or another) prior to the end of the month.

Bendalin's response on December 8 said:

> While it is my intention to withdraw as of December 31st, I can obviously not do so until we have agreed on terms. As such, I will be happy to provide formal notice of my withdrawal, and my consent for you to transfer a portion of your interest when we have agreed to all terms of the withdrawal.

Youngblood retorted by claiming that "[y]ou have already given notice of your withdrawal date of December 31, 2008," and asking Bendalin to review Texas law and talk to

---

[6]Mahurin testified Bendalin would be gone by January 1, 2009.  Again, discovery that Bendalin was Vantium's general counsel as of December 2 was not made until after this suit was filed.

[7]Fair Market Value.

Martin regarding the task of "evaluating the applicable FMV before the date of your withdrawal has occurred." Again, Bendalin responded by saying, "I'm not sure why you think I have already given notice of withdrawal for any particular date, because I have not. I have told you what my intentions are, but those intentions are not yet final, and as I have mentioned to you before, my intentions cannot be final until we agree on terms."

On December 11, 2008, Youngblood sent this e-mail to all MBG employees:

As some of you are already aware, Ron Bendalin was approached last month by a client of McGlinchey Stafford to join them as their general counsel, and (after he initially declined that offer and they continued to pursue) he ultimately accepted an offer that he believes is too good to refuse. He will be leaving our firm as of December 31, 2008. Ron has commented that, ironically, his departure comes at a time when the prospects for MSYB [the Firm] are better than they have been for the last two years, but he feels that he has been offered the opportunity of a lifetime.

We have contacted virtually all of our clients about this change and none of them appear to have the slightest problem with it in terms of their commitment to, or expectations of, MSYB. MSYB will continue as usual and there will be no other personnel changes within our group. We have plans to soon add another lawyer to the group but after the end of the year, and thereafter until further notice, David Pederson and I will handle all matters formerly handled by Ron prior to his departure date. The name of the continuing entity will change to "McGlinchey Stafford and Youngblood & Associates, LLP," but the acronym we use will continue to be "MSYB."

On December 12, 2008, Murphy received mail from Bendalin's new Vantium e-mail account.

Youngblood did not want McGlinchey to purchase Bendalin's fifty-percent interest in YB partnership because he was afraid of losing control of the organization. Thus, Youngblood informed McGlinchey that he would be purchasing Bendalin's interest. On December 16, 2008, Youngblood and Bendalin had their last face-to-face meeting. On December 17, e-mails

8

discussing valuation of Bendalin's interest were exchanged, with Bendalin offering a price of $375,000.00.

Bendalin went on Christmas vacation December 20 and did not return until December 29.

On December 29, Wall sent the following e-mail to Bendalin:

> I talked to [Youngblood] today, and he told me that your termination date will be 12/31/08. This means that your insurance benefits will end on 12/31/08. We had previously discussed a term date of 1/2/09, which would have extended your insurance through 1/31/09, so I wanted to make sure you were aware of the change.

After explaining to Wall that he had "not officially withdrawn and [would] not do so unless and until [Youngblood] and I agree on the withdrawal terms," Bendalin forwarded this e-mail to Youngblood with the notation:

> I have not officially withdrawn as of 12/31. . . . You announced to [Aguilar] early in December that you were going to buy out my interest, even before making any offer to me for doing so. I proposed terms to you on December 17th, and you have no proposal or counterproposal to me yet, notwithstanding your assurance on the 19th that you would have a proposal ready for me upon my return from vacation today. Since you and I have not agreed to any terms, then I am not planning to withdraw. If we can agree on terms, then we can proceed.

Bendalin testified that, from his perspective, he was

> coming back from vacation back in the office on the 29th expecting to receive the offer that Mr. Youngblood had promised on December 19th, and instead I came back to find out that he was cutting off my access, cutting off my benefits, terminating me and basically evicting me from the partnership. . . .

Youngblood responded to his e-mail by referencing the partnership act and arguing that Bendalin was "all wet with that approach" since he "[o]bviously . . . [had] not read the . . . Act." Bendalin replied to Youngblood, forwarding the e-mail to Aguilar as well, stating:

9

> I am afraid that this is not going well. I will not be withdrawing from YB as of December 31, unless and until Eldon and I can agree to terms. I am sending this to you so you know that any acts of YB will continue to require my participation, and that I am not resigning as a Manager of MSYB.

On December 30, 2008, Martin e-mailed Bendalin "[b]y now you have seen my valuation models. It was disappointing to see all your hard work under both methods to be a negative number." YB Partnership was contending that Bendalin owed the partnership for contribution. Youngblood never purchased Bendalin's interest, although the interest was absorbed, and Bendalin was unable to sell his YB Partnership interest because Youngblood did not consent as required under the partnership agreement.

On December 31, 2008, Youngblood sent this e-mail to all of MBG's staff stating, "Effective at the close of business December 31, 2008, Ron Bendalin ceased to be associated with our firm." Bendalin responded by replying to all the middle managers, informing that they should "[p]lease be advised that I am still with the firm indefinitely. I am available for any and all questions you or your clients may have. If you need me and I am not here, you can always reach me via email and on my cell phone, as has always been the case." He sent another e-mail to Youngblood stating:

> I have not given you express notice of withdrawal. Any discussions you and I have had on this issue were conditioned on you and I working out a satisfactory resolution of my interest. We have not done so, therefore no notice of withdrawal has been given. I am still your partner in YB, and I am still a manager of MSYB.

Thereafter, Youngblood gave orders to cancel Bendalin's computer access and benefits, over Bendalin's e-mail protest. Without Bendalin's consent, Youngblood amended the YB Partnership agreement on December 31, writing out Bendalin as a partner, giving Pederson and

10

his daughter Hilary each a one percent interest in YB Partnership, assuming a ninety-eight percent interest in YB Partnership, and amending the name of the partnership to "Youngblood & Associates."

While the new year resulted in some concession with respect to the Firm, the dispute over the YB Partnership interest was refueled. On January 6, 2009, Bendalin sent an e-mail to Youngblood and Aguilar resigning as manager of the Firm. He agreed that the Firm's name could be altered in exchange for Youngblood "waiv[ing] any right you or the partnership may have to argue or claim that I would be in violation of the partnership agreement (or any other agreement) for failure to provide services to YB, MS, MSYB or its subs." The Firm's name was changed to McGlinchey Stafford and Youngblood & Associates, LLP.[8]

Despite this agreement, it became clear, on January 8, 2009, that Youngblood's and Bendalin's differing interpretations to the question of whether there was a withdrawal, and whether said withdrawal was wrongful, would not be easily resolved. Martin experienced resistance when attempting to remove Bendalin from the YB Partnership account. A February 29, 2009, e-mail from Bendalin to Northern Trust banker Craig Sutton, Martin, and Youngblood stated, "Notwithstanding [Youngblood's] representation below, I have not withdrawn from the partnership as of 12/31/08, and no changes may be made to this account without my consent."

On March 20, 2009, Bendalin asked for the Firm financial statements for January and February. Youngblood declined to deliver them, and Bendalin responded:

---

[8]For clarity, this opinion will continue to refer to this entity as the Firm.

11

> Your protestations notwithstanding, I remain a 50% partner in the 80% shareholder of MSYB. As such I am entitled to MSYB financials. I have confirmed with Rudy Aguilar that he has no objection to you providing the financials to me. Your refusal to provide me with this information is a breach of your duties to me as a partner.

The parties' mediation efforts failed, and suit was filed by YB Partnership.[9]

### C. The Partnership Agreement and the Pleadings

YB Partnership sued Bendalin, seeking declaratory judgment (a) that, "on or before December 31, 2008, Defendant Bendalin withdrew from, and ceased to be a partner in, Plaintiff and (b) that the withdrawal of Defendant Bendalin from Plaintiff was 'wrongful' within the meaning of TRPA Sec 6.02(b)." It also asserted a cause of action for breach of the Agreement based on a contention that Bendalin's withdrawal prior to ten years of service was wrongful, that "the redemption price under TRPA must be calculated as if there had been a winding up of the Partnership on December 31, 2009," and that Bendalin owed $303,254.00, plus attorney's fees for wrongful withdrawal.[10]

Bendalin filed third-party claims against Youngblood, Pederson, and Hilary, individually. He "challeng[ed] the validity of the partnership known as Plaintiff Youngblood & Associates . . . and the ownership interests therein of its three alleged partners" because the amendments to the Agreement were made without his written consent. Citing the e-mails detailed above, Bendalin claimed that he was still a fifty percent owner of YB Partnership and that he was wrongfully expelled. Noting that Youngblood held Bendalin out as a partner after the alleged withdrawal to

---

[9]Suit was filed in the name of Youngblood & Associates. For clarity, we will continue to refer to this entity as YB Partnership.

[10]Claims of breach of fiduciary duty, the duty of loyalty, and duty of care were later added.

12

Northern Trust Bank in connection with a renewal of YB Partnership's line of credit, Bendalin asserted the affirmative defense of estoppel and sought attorney's fees and costs of court. In a motion for partial summary judgment, Bendalin sought a declaration that: "(1) Bendalin is a 50% partner in YB [Partnership]; (2) Hilary and Pederson do not each own 1% (or any) interests in YB [Partnership] or . . . its alleged successor; (3) Youngblood does not own 98% of YB [Partnership] or . . . its alleged successor; and (4) the [Youngblood & Associates] Amendment is invalid and void."[11]

The YB Partnership agreement, in addition to fallback provisions in the Texas Revised Partnership Act, govern the resolution of arguments raised in this case. In response to the petition, Bendalin first argued that he never withdrew from YB Partnership. Section 8.1 of the Agreement specified that "[a]ll notices and other communications required or permitted to be given under this Agreement shall be in writing, addressed to the persons at their respective addresses as provided below . . . ." Pederson, Mahurin, and Murphy all testified that they did not see any writing in which Bendalin gave notice of withdrawal from YB Partnership. Youngblood agreed that no written notice was given, but claimed that written notice was not required because it was not a notice contemplated by the Agreement. He believed, as explained below, that the Agreement did not allow Bendalin to withdraw prior to ten years of service to YB Partnership.

---

[11]The trial court initially granted Bendalin's partial summary judgment motion and issued the requested declaration, but this ruling was later vacated. Because the court found that Bendalin withdrew as of December 2, it found that third-party claims and challenges to the changes in YB Partnership failed since he was no longer a partner as of that date. As set forth below, we find that December 31 was the actual date of withdrawal. Our finding revives Bendalin's claims.

13

YB Partnership was created because "the Partners desire[d] to form a general partnership . . . for the practice of law." Under the YB Partnership Agreement (Agreement), the partners were to provide normal services, defined as "services performed by Bendalin or Youngblood at 100% of the general level of responsibility, kind, quality and consistency as performed during his employment with Akin, Gump, Strauss, Hauer & Feld, LLP on or before the effective date [of] this Agreement." The agreement defined service commitment as "the Bendalin Service Commitment or the Youngblood Service Commitment or both." A section discussing a capital reserve fund provided that "[o]ne-half the balance of such reserve will be immediately paid to Youngblood if Bendalin should voluntarily cease performing Normal Services to the Partnership before the fulfillment of the Bendalin Service Commitment, and the other half of such reserve shall . . . be paid to VRM. . . ." "As used in this paragraph the 'Bendalin Service Commitment' is the commitment of Bendalin to provide his Normal Services for the Partnership for at least the next ten (10) consecutive years after the beginning of Partnership operations."

The ten-year commitment was not mentioned anywhere else in the Agreement. Consequently, Bendalin argued that there was no requirement that he perform normal services for a certain specified time and that the ten-year time frame referenced in the Agreement was simply a prerequisite which would entitle him to the reserve funds on his departure. Thus, he believed that his withdrawal was not wrongful and that he was entitled to be paid for his interest in YB Partnership in accordance with the Agreement. In a section labeled "Buy-Out on Death, Incapacity or Retirement of Bendalin or Youngblood," the Agreement states:

14

> At such time as the first of Bendalin or Youngblood should voluntarily withdraw from performing services for the Partnership after the fulfillment of his respective Service Commitment . . . his partnership interest will be purchased by the other for a price . . . equal to 125% of the average annual Net Profits for the Partnership during the Base Period, payable in five equal annual installments on January 15 of the year following the event giving rise to such right and obligation to purchase and on January 15 of each consecutive calendar year thereafter (the "Buy-Out Arrangement").

Because "respective Service Commitment" was not defined within the context of this subsection, Bendalin sought the buy-out amount referenced in this section.

Next, Bendalin argued to the court that YB Partnership was merely a holding company for the Firm and that it did not actually conduct any business. Thus, Bendalin claimed that the normal services provision was inapplicable, no services were actually performed under YB Partnership since all services were performed through the Firm, monies collected from those services were paid to the Firm, and all employees were employees of MBG and the Firm. Thus, he believed that he was not in breach of the normal services provision despite his position as Vantium's general counsel. As an example, Bendalin pointed out that he was able to perform legal services for McGlinchey as a nonequity law partner without violating the Agreement, and by analogy, the Agreement allowed him to be Vantium's general counsel while also serving as a YB partner.

Youngblood argued that the purpose of YB Partnership contemplates the practice of law, that normal services were expected and defined under the contract, that YB Partnership is not a holding company, as evidenced by Murphy's employment contract with YB Partnership, and that

15

Bendalin could not perform normal services as contemplated under the Agreement due to his employment with Vantium.

Bendalin complained to the court that he did not receive any money for his interest which was absorbed by Youngblood in the amendment to the Agreement, even though the Agreement specifies that "[n]o Partner shall have the right to assign any of its rights or obligations under this Agreement, or its interest in the Partnership, except to an entity that is an Affiliated Person as to such Partner, or to any other Person on the prior written consent of the other Partners."

D.     The Trial

Trial to the bench was bifurcated, with a liability phase and damage phase.  In the liability phase, the trial court properly determined that TRPA applied to this case instead of the Texas Business Organizations Code (TBOC) because the YB Partnership Agreement was signed in 2003.  In *Ingram v. Deere*, 288 S.W.3d 886, 894 n.4 (Tex. 2009), the Texas Supreme Court explained:

> Three statutory regimes have governed partnerships formed in Texas—TUPA, TRPA, and the Texas Business Organizations Code (TBOC). TRPA, enacted in 1993, replaced TUPA.  Act of May 31, 1993, 73rd Leg., R.S., ch. 917, § 1, 1993 Tex. Gen. Laws 3887, 3893.  TRPA governs partnerships formed on or after January 1, 1994, and other, existing partnerships that elected to be governed by it. TEX. REV. CIV. STAT. art. 6132b–11.03(a).  In 2003, the TBOC replaced TRPA. Act of May 29, 2003, 78th Leg., R.S., ch. 182, § 1, 2003 Tex. Gen. Laws 267, 592–93.  The TBOC governs partnerships formed on or after January 1, 2006, and other partnerships that elect to be governed by the TBOC.  TEX. BUS. ORGS. CODE § 402.001.  In addition, TRPA and the TBOC contain transition rules, providing that the preceding law will apply to existing partnerships for a period of years after each act's effective date, unless the partnership elects to be governed by the new act immediately.  TEX. REV. CIV. STAT. art. 6132b–11.03; TEX. BUS. ORGS. CODE § 402.001. On January 1, 2010, TRPA will expire, and the TBOC will

16

apply to all partnerships, regardless of their formation date. TEX. REV. CIV. STAT. art. 6132b-11.03. . . .

TEX. REV. CIV. STAT. art. 6132b-1.01. TRPA[12] has expired, and the TBOC states that:

On or after January 1, 2010, if a domestic entity formed before January 1, 2006 . . . has not taken the actions specified by Section 402.003 or 402.004 to elect to adopt this code:
(1) this code applies to the entity and all actions taken by the managerial officials, owners, or members of the entity, except otherwise expressly provided by this title.

TEX. BUS. ORGS. CODE ANN. § 402.005(a)(1) (West Pamph. 2012). However, this case was filed in 2009, and all parties agreed to apply TRPA.

The court found for YB Partnership in the liability phase and issued findings of fact and conclusions of law to that effect. Specifically, the court found that:[13]

(1)     "YB is the only entity in this case in which Youngblood and Bendalin owned individual interests";
(2)     "the practice of YB is to provide the necessary legal services for, and to be responsible for, the residential document preparation services of" the Firm;
(3)     "Bendalin . . . would continue to provide 'Normal Services' through June 30, 2013";
(4)     once Bendalin "began performing his contractually described job description as general counsel of Vantium, Bendalin would no longer be able to perform 'Normal Services' to the YB Partnership";
(5)     "[o]n December 2, 2008, Bendalin began performing services at Vantium"[14];
(6)     "Bendalin's withdrawal from YB occurred by December 2, 2008";

---

[12]Act of May 31, 1993, 73rd Leg., R.S., ch. 917, 1993 Tex. Gen. Laws 3887.

[13]After a motion for new trial, the court entered amended and clarifying findings of fact incorporating the original findings of fact and conclusions of law, entered during the liability phase, in their entirety.

[14]Bendalin's brief references testimony that he only worked part time December 2, 2008. He cites to a response to YB Partnership's proposed findings of fact and conclusions of law, purportedly as evidence demonstrating this alleged fact. We will not consider the parties' pleadings as evidence. When counsel mentioned this part-time commitment to the court, the court stated the recital was "contrary to my notes."

17

(7)     "[b]ecause he ceased to be a partner of YB no later than December 2, 2008 . . . Bendalin's written consent was not required for the subsequent amendment of the Agreement to change the name of the Partnership to Youngblood & Associates and to add new partners";

(8)     "[a]fter December 2, 2008, Bendalin could not condition his withdrawal on whether he and Youngblood agreed on the value or disposition of Bendalin's interest in YB and Bendalin could not retract his notice of withdrawal"; and

(9)     "[t]he term of the Partnership was definite."[15]

Therefore, the court concluded that:

(1)     "[w]hen Bendalin signed the Vantium contract on November 20, 2008 . . . he anticipatorily breached the Agreement by rendering it impossible for him thereafter to continue to provide 'Normal Services' to YR";

(2)     "Bendalin's expression of will to withdraw to Youngblood on November 21, 2008 was notice to YB of such will to withdraw under TRPA § 1.02(e)";

(3)     Bendalin breached the Agreement because he could not perform normal services;

(4)     Bendalin's breach of the Agreement prior to the ten year "Service Commitment was a breach of an express provision of the Agreement and therefore a wrongful withdrawal under TRPA § 6.02(b)(1)";

(5)     "Bendalin's interest was automatically redeemed by the Partnership as of December 2, 2008";

(6)     "A wrongfully withdrawing partner must 'contribute' to the partnership, in the proportion in which the partner shares partnership losses, 'the amount necessary to satisfy partnership obligations.' TRPA § 8.06(c)(1)";

(7)     "After December 2, 2008, Plaintiff and Youngblood engaged in no conduct to the detriment or disadvantage of Defendant Bendalin,"

(8)     the amendment to the Agreement was valid; and

(9)     Bendalin's affirmative defenses failed.

Based on its ruling in the liability phase, the trial court instructed both parties to prepare their valuation experts to testify on the redemption value of Bendalin's interest as of December 2, 2008, assuming a wrongful withdrawal.

---

[15]These lists are merely excerpts from the court's findings of fact and conclusions of law.

The parties' valuation experts produced wildly differing valuations. YB Partnership's valuation expert, William Alan Barnard, testified that the liquidation winding up value (not fair value) of the partnership as of December 2, 2008, would have been "a negative $783,716," of which Bendalin would be required to contribute "$391,858." YB Partnership's major asset was its ownership of the Firm.[16] Barnard testified that he calculated the Firm's wind-up value in order to determine the value of the Firm's interest. He testified the book value of the eighty percent interest was a negative $364,696.00 on a liquidating basis. The Firm's agreement contained a buy-out provision that would allow McGlinchey to purchase YB Partnership's interest and that the eighty percent interest in the Firm which was owned by YB Partnership would be "negative 122,565" under the scenario envisioned in the Firm Agreement. Under this method, Bendalin would be required to pay $61,282.00. Barnard also listed the payments that would be made to Murphy if she fulfilled a ten-year service agreement as a liability of the YB Partnership. Barnard took the total reserve liability, which he calculated to be $425,466.00 and added the "the negative assets of. . . 358,000" to come to a negative $783,716.00.[17]

Bryce Peter Erickson testified that Bendalin's interest was worth "$1.1 million roughly." In arriving at this conclusion, he consulted "what the marketplace viewed of this asset."

---

[16]Bendalin argued that "80% of the value of [the Firm] needed to be treated as an asset of YB, which would result in Bendalin's interest having a sizable positive value."

[17]Barnard had previously concluded that the fair value of YB Partnership's interest was $94,000.00, which was halved to account for Youngblood's personal goodwill.

Erickson used fair market value[18] to determine the Firm's value because he "assumed that under the premise of the wind-up of YB that the [Firm's] asset value would be maximized like a prudent investor would." He valued the Firm at $2,050,000.00 if McGlinchey purchased the Firm's interest pursuant to the Firm's Agreement, which would include a twenty-five percent contractual discount. According to Erickson, the eighty-percent interest in the Firm was worth $2.38 million.[19] Erickson did not include the Bendalin or Youngblood reserve into his calculation because he did not view the reserves as a liability, and he found that discounting the rate based on personal goodwill of Youngblood would be inappropriate since this business was a "high-volume, fixed-fee document processing shop."

Attorney's fees and expert fees were also provided. In its final judgment, the court ordered Bendalin to pay YB Partnership $43,831.00 as his contribution, $5,259.72 and $1,413.16 as prejudgment interest, $295,817.50 in attorney's fees, and $69,563.85 as fees for "Plaintiff's appraiser and expert."[20]

---

[18]Fair market value is typically defined as the amount a willing buyer, who desires to buy, but is under no obligation to buy, would pay to a willing seller, who desires to sell, but is under no obligation to sell. *City of Pearland v. Alexander*, 483 S.W.2d 244, 247 (Tex. 1972).

[19]Erickson used three different methodologies to value the eighty percent interest in the Firm. One methodology produced a value of $2.7 million, another methodology yielded a figure of $4.17 million, and a value of $5.24 million was achieved using a third methodology.

[20]The court also unconditionally awarded "an additional $75,000.00 for additional services that will be rendered in the event of an appeal by Defendant Bendalin to the Court of Appeals."

This appeal ensued.[21]  Bendalin complains that the trial court erred:  (1) by finding that he withdrew from YB Partnership; (2) by determining the withdrawal date to be December 2, 2008; (3) by rejecting his quasi-estoppel argument; (4) in calculating the redemption interest; (5) in awarding expert fees; and (6) in awarding "Otherwise Excessive And/Or Improper" attorney's fees.  Contending that the court did not order Bendalin to pay enough money, YB Partnership cross-appeals, arguing that the trial court erred in failing to determine that all four reserves in the Agreement were liabilities of YB Partnership.

II.     ANALYSIS

A.      Standards of Review

There was no challenge to the trial court's amended and clarifying findings of fact and conclusions of law, which incorporated the findings in the liability phase.  Findings of fact in a bench trial "are of the same force and dignity as a jury's answers to jury questions."  *Lambright v. Trahan*, 322 S.W.3d 424, 430 (Tex. App.—Texarkana 2010, pet. denied) (citing *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991)).  Unchallenged findings of fact are binding unless the contrary is established as a matter of law or there is no evidence to support the finding.  *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Bundren v. Holly Oaks Townhomes Ass'n*, 347 S.W.3d 421, 429–30 (Tex. App.—Dallas 2011, pet. denied).  However, mixed questions are reviewed "under an abuse of discretion standard."[22]  *Jakab v. Gran Villa*

---

[21]Bendalin filed a motion for new trial, which was granted, and resulted in the second final judgment that vacated the original judgment.  The vacated judgment is not referenced in this opinion.

[22]In this transfer case, we employ the standard of review used by the Dallas Court of Appeals in place of the de novo standard employed by this Court.

*Townhouses Homeowners Ass'n*, 149 S.W.3d 863, 865 (Tex. App.—Dallas 2004, no pet.); *Estates of Elkins v. Cnty. of Dallas*, 146 S.W.3d 826, 828 (Tex. App.—Dallas 2004, no pet.). A trial court abuses its discretion when it acts without reference to any guiding rules and principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003). Entry of a finding on a mixed question with legally insufficient evidence to support the same would constitute an abuse of discretion.

In reviewing a legal sufficiency complaint of an adverse finding on which the appellant did not have the burden of proof, the appellant must demonstrate on appeal that no evidence supports the adverse finding. *Monasco v. Gilmer Boating & Fishing Club*, 339 S.W.3d 828, 830 (Tex. App.—Texarkana 2011, no pet.) (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983)). When a party attacks the legal sufficiency of an adverse finding on an issue on which he or she has the burden of proof (the quasi-estoppel argument), that party must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001).

In determining legal sufficiency, we analyze "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Williams v. Nationstar Mortg., L.L.C.*, 349 S.W.3d 90, 92–93 (Tex. App.—Texarkana 2011, pet. denied) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)); *see Walker & Assocs. Surveying, Inc. v. Austin*, 301 S.W.3d 909, 916 n.4 (Tex. App.—Texarkana 2009, no pet.). "We credit favorable evidence if a reasonable jury could, and disregard contrary evidence unless a reasonable jury could not." *Williams*, 349 S.W.3d at 93 (citing *Wilson*, 168 S.W.3d at 827). Because the judge is the sole arbiter of witness credibility and the weight given to their testimony in a bench trial,

22

we may not substitute our judgment for the judge's as long as the evidence falls within the zone of reasonable disagreement. *Id*. "Although we consider the evidence in a light most favorable to the verdict, indulging every reasonable inference that supports it, we may not disregard evidence that allows only one inference." *Id*.

A majority of Bendalin's complaints relate to the trial court's conclusions of law, which are reviewed de novo. *State Office of Risk Mgmt. v. Joiner*, 363 S.W.3d 242, 247 (Tex. App.— Texarkana 2012, pet. granted) (citing *Villagomez v. Rockwood Specialties*, *Inc*., 210 S.W.3d 720, 727 (Tex. App.—Corpus Christi 2006, pet. denied)). Conclusions of law may not be challenged for factual sufficiency, but are reviewed to determine their correctness based on the facts. *Id.* (citing *Rischon Dev. Corp. v. City of Keller*, 242 S.W.3d 161, 166 (Tex. App.—Fort Worth 2007, pet. denied); *Nat'l Union Fire Ins. Co. v. Burnett*, 968 S.W.2d 950, 953 (Tex. App.—Texarkana 1998, no pet.)). We will uphold conclusions of law if the judgment can be sustained on any legal theory supported by the evidence. *Id.* (citing *City of Houston v. Cotton*, 171 S.W.3d 541, 546 (Tex. App.—Houston [14th Dist.] 2005, pet. denied)). Thus, incorrect conclusions of law do not require reversal if the controlling findings of fact support the judgment under a correct legal theory. *Id*.

"The law applicable to construction of contracts has been applied to partnership agreements." *Clark v. Cotten Schmidt*, *Ltd.*, 327 S.W.3d 765, 772 (Tex. App.—Fort Worth 2010, no pet.) (citing *In re Waggoner Estate*, 163 S.W.3d 161, 165 (Tex. App.—Amarillo 2005, no pet.)). "We construe contracts 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' and 'will avoid when possible and proper a construction

which is unreasonable, inequitable, and oppressive.'" *Id.* (quoting *Frost Nat'l Bank v. L & F Dist. Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005); *Reilly v. Rangers Mgmt.*, *Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)).

Our primary concern when construing contracts is to ascertain the true intent of the parties as expressed in this jointly drafted contract. *Id.* at 772–73; *Anderson v. New Prop. Owners' Ass'n of Newport*, *Inc.*, 122 S.W.3d 378, 386 (Tex. App.—Texarkana 2003, pet. denied). We examine and consider the entire contract in an effort to harmonize and give effect to all provisions so that none are rendered meaningless. *Clark*, 327 S.W.3d 773 (citing *J.M. Davidson*, *Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)). "We presume that the parties to the contract intend every clause to have some effect. We give terms their plain, ordinary, and generally accepted meaning unless the contract shows that the parties used them in a technical or different sense." *Id.*

Lack of clarity or a disagreement among the parties does not necessarily create an ambiguity. *Id.* (citing *Universal Health Servs.*, *Inc. v. Renaissance Women's Group*, *P.A.*, 121 S.W.3d 742, 746 (Tex. 2003)). Rather, whether "a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered." *Id*. "If, after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous and we construe it as a matter of law." *Frost Nat'l Bank*, 165 S.W.3d at 312. But if a contract is ambiguous, then interpretation of the contract presents a fact issue. *Transcon. Gas Pipeline Corp. v. Texaco*, *Inc.*, 35 S.W.3d 658, 665 (Tex. App.—Houston [1st Dist.] 2000, pet. denied). "When the [contract] is

24

not ambiguous on its face, extrinsic evidence may not be used to create an ambiguity." *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 745 (Tex. 1998); *see CenterPoint Energy Houston Elec., L.L.P. v. Old TJC Co.*, 177 S.W.3d 425, 431 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

B.      Our Holdings

1.      *Bendalin's Withdrawal Was Effective Without Written Notice*

Section 8.1 of the YB Agreement provides that "[a]ll notices and other communications required or permitted to be given under this Agreement shall be in writing." On appeal, Bendalin argues that written notice to withdraw was required under the YB Agreement and that he never withdrew from YB Partnership because he did not provide such notice. He cites to Youngblood's e-mail where Youngblood wrote, "Sandra M[artin] and I need a signed notice from you of your withdrawal from YB Partnership to be effective December 31," as evidence suggesting that Youngblood acknowledged the requirement of the notice to be in writing. Also referenced were Bendalin's e-mails expressing his position that he had not withdrawn as a partner and could not withdraw until an agreement on the terms of withdrawal were reached.

YB Partnership argues that the YB Agreement's written notice provision was not triggered because written notice was required only for notices contemplated in the Agreement, and Bendalin's withdrawal before ten years was not contemplated. However, by its own terms, the agreement contemplates the "voluntar[y] ce[ssation of] performing Normal Services to the Partnership on or before the fulfillment of the Bendalin Service Commitment," in the Section

25

3.2(b) reserves provision. By the plain terms of the contract, written notice to withdraw was required.

This finding, however, does not render Bendalin's oral notice ineffective, although it is not in compliance with the YB Agreement. The written notice provisions, imposed by YB Partnership in its Agreement, were intended for YB Partnership's benefit. The YB Agreement spells out the written notice requirement, describes the place of delivery where notice should be mailed, but then says that "[e]ach notice delivered in any other manner shall be deemed delivered as of the time of actual receipt thereof." Moreover, because the YB Agreement is silent on the *effect* of oral notice, we look to TRPA provisions to fill in the gaps.[23]

TRPA specifies, "Statutory Provisions that may not be Varied by Agreement," and states that "[a] partnership agreement or the partners may not: . . . vary the power to withdraw as a partner" where there is an express will to withdraw, "except to require the notice to be in writing." TEX. REV. CIV. STAT. ANN. arts. 6132b-1.03(b)(5). However, TRPA provisions do not state that oral notice is ineffective if the notice is not received in writing where required. In fact, the rules suggest the opposite. As reiterated by the comments to TRPA Article 6132b, Section 1.03(b)(5), "a partner has the power to withdraw at any time." *Id.* at cmt. The requirement that notice be in writing does not extinguish this power.

The rules provide that a person ceases to be a partner when an event of withdrawal occurs. TEX. REV. CIV. STAT. ANN. art. 6132b–6.01(a). "An event of withdrawal of a partner occurs on: (1) receipt by partnership of notice of the partner's express will to withdraw as a

---

[23]"To the extent that the partnership agreement does not otherwise provide, this Act governs the relations of the partners and between the partners and the partnership." TEX. REV. CIV. STAT. ANN. art. 6132b-1.03(a).

26

partner . . . ." TEX. REV. CIV. STAT. ANN. art. 6132b-6.01(b)(1). TRPA Article 6132b, Section 1.02 states that "[a] person has notice of a fact if the person . . . has received a communication of the fact," and "[r]eceipt of notice by a partner of a fact relating to the partnership is effective immediately as notice to the partnership." TEX. REV. CIV. STAT. ANN. art. 6132b-1.02.

Thus, Bendalin had the power to withdraw, and expressed his intent of withdrawal to Youngblood, triggering an event of withdrawal pursuant to TRPA Article 6132b, Section 6.01(b)(1). The trial court found that notice of withdrawal under TRPA 6132b-1.02, which does not require written notice, was received. Evidence from Youngblood, Martin, Pederson, and Murphy emphasizes the unequivocal nature of the oral withdrawal. We find that lack of written notice did not render the withdrawal ineffective.[24] To hold otherwise would require this Court to overlook the practical implications of a partner's actual departure from a partnership.

We overrule Bendalin's point of error suggesting that the trial court erred in finding an event of withdrawal.

### 2.     Bendalin's Attempts to Rescind His Withdrawal Were Ineffective

In a multifarious point of error grouped with the argument that he did not withdraw from YB Partnership,[25] Bendalin argues that any oral withdrawal was revoked, as demonstrated by the many e-mails stating he would not be withdrawing and could not withdraw until terms of

---

[24]Moreover, if applying all of the terms of Section 8.1, it could be reasoned that the oral notice was "deemed delivered as of the time of actual receipt thereof."

[25]"A point of error is multifarious if it embraces more than one specific ground of error." *In re J.L.B.*, 349 S.W.3d 836, 839 n.5 (Tex. App.—Texarkana 2011, no pet.).

withdrawal were agreed on.[26] Youngblood's testimony of Bendalin's unequivocal expression of withdrawal was sufficient for the trial court to find that Bendalin withdrew from the partnership. TRPA Article 6132b, Section 1.01(19) defines a withdrawn partner "as a partner with respect to whom an event of withdrawal has occurred. A partner withdraws if an event of withdrawal has occurred with respect to that partner under Section 6.01." TEX. REV. CIV. STAT. ANN. art. 6132b-1.01(19). Therefore, once the partnership received notice of an express will to withdraw under Section 6.01(b)(1), Bendalin became a "withdrawn partner," and his retraction would not operate to automatically make him partner again. *Id.* In short, partners have no obligation to remain partners. *Bohatch v. Butler & Binion*, 977 S.W.2d 543, 544 (Tex. 1998).

We overrule Bendalin's contention that the trial court erred in failing to give effect to the retraction of his withdrawal from YB Partnership.

### 3. Quasi-Estoppel Does Not Negate Bendalin's Withdrawal

Bendalin further asserts that the affirmative defense of quasi-estoppel prevents Youngblood from asserting that Bendalin was no longer a partner. The line of credit issued by Northern Trust Bank, which was secured by YB Partnership's certificate of deposit, was due for renewal in September 2009. Youngblood signed the renewal note. Martin sent an e-mail to Bendalin October 12, 2009, seeking his signature on the renewal, and Bendalin signed it. Because Bendalin was represented to be a partner on these loan documents, Bendalin suggests

---

[26]Bendalin does not cite authority to support this position. While there may be no such authority, and Bendalin argues to make some, it is risky to fail to cite any authority for an argument. *Scott-Richter v. Taffarello*, 186 S.W.3d 182, 191 (Tex. App.—Fort Worth 2006, pet. dism'd); *Bowles v. Reed*, 913 S.W.2d 652, 661 (Tex. App.—Waco 1995, writ denied); *Malouf v. Dallas Athletic Country Club*, 837 S.W.2d 674, 678 (Tex. App.—Dallas 1992, writ dism'd w.o.j.); *see* TEX. R. APP. P. 38.1(i).

that the trial court erred in failing to apply "the doctrine of quasi-estoppel to Youngblood regarding the Northern Trust documents." He seeks to use the doctrine to escape the fact of withdrawal.

Under the section "Conclusions of Law," the trial court found that Bendalin's affirmative defense was not supported by sufficient evidence. Quasi-estoppel is an affirmative defense which requires a defendant to plead, prove, and secure findings on the defense. *Stanley Works v. Wichita Falls Indep. Sch. Dist.*, No. 08-11-00015-CV, 2012 WL 1422022, at *6 (Tex. App.—El Paso Apr. 25, 2012, pet. filed) (citing *Woods v. William M. Mercer*, *Inc.*, 769 S.W.2d 515, 517 (Tex. 1988); *Clark v. Cotten Schmidt*, *L.L.P.*, 327 S.W.3d 765, 770 (Tex. App.—Fort Worth 2010, no pet.)); *see* TEX. R. CIV. P. 94. Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. *Lopez v. Munoz, Hockema & Reed*, *L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000). The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit.[27] *Id.* Although Bendalin suggests that "listing Bendalin as the current and only partner of YB" was "wholly inconsistent with Youngblood's position that Bendalin had withdrawn," this position is contrary with TRPA provisions.

TRPA Section 3.06(b) states that "[a] representation or other conduct indicating that a person is a partner in an existing partnership, if that is not the case, does not itself make that person a partner in the partnership." TEX. REV. CIV. STAT. ANN. art. 6132b-3.06(b). Moreover, the trial court could have decided that, because Bendalin refused to allow alteration of the

---

[27]There is testimony that money from the line of credit went to the partners personally, suggesting that Youngblood's signature on the renewal note did not result in a personal disadvantage to Bendalin.

Partnership's signature card at Northern Trust Bank, Bendalin was attempting to represent himself as a YB partner, and Youngblood had no choice but to acquiesce. Thus, the court could have determined that: (1) Youngblood's signature on documents was not inconsistent with his position that Bendalin was not a partner, since it arose out of necessity; (2) Youngblood's representation that Bendalin was a partner was not to Bendalin's detriment because there was testimony that he personally benefited from the funds; and/or (3) the action in signing the note was not unconscionable.[28] Accordingly, we find that Bendalin did not show his entitlement to the defense of quasi-estoppel as a matter of law.

### 4. Bendalin's Withdrawal Was Effective December 31, 2008

Bendalin complains that the trial court's date of withdrawal of December 2, 2008, was contrary to Youngblood's acknowledgement that withdrawal occurred either on November 21, 2008, or December 31, 2008.[29] The trial court appeared to base its decision on the date of commencement of Bendalin's employment with Vantium,[30] and witness testimony that Bendalin was unwilling to change his mind to leave the Partnership. Bendalin is correct that this was not the proper method to determine the date of withdrawal. The date of withdrawal is set by TRPA Section 6.01. "An event of withdrawal of a partner occurs on: (1) receipt by partnership of

---

[28]*See Besteman v. Pitcock*, 272 S.W.3d 777, 787–88 (Tex. App.—Texarkana 2008, no pet.), for a discussion regarding the standard for unconscionability.

[29]Bendalin makes an estoppel-type argument based on Youngblood's pleading that the withdrawal date was December 31. Because the withdrawal date is to be determined by application of TRPA Section 6.01, we need not address this argument.

[30]From the evidence presented, we are uncertain whether Bendalin's position with Vantium actually thwarted the business of YB Partnership. Bendalin argues the opposite. He points out that he was entitled to work with Vantium in his capacity as a nonequity partner of McGlinchey.

notice of the partner's express will to withdraw as a partner on the date of receipt of the notice or on a later date specified in the notice." TEX. REV. CIV. STAT. ANN. art. 6132b-6.01(b)(1).

The trial court found that Youngblood was notified November 21, 2008, of Bendalin's express will to withdraw. YB Partnership's initial pleading refers to November 21 as an anticipatory breach of the partnership agreement, while referencing December 31 as the date in the notice of withdrawal. The only evidence on this point states that this initial notification specified a withdrawal date of December 31, and both Youngblood's and Bendalin's written e-mails establish that Youngblood understood the "withdrawal from the YB Partnership to be effective December 31." Tellingly, Youngblood, after the November 21 meeting, drafted a factual statement explaining that he understood the withdrawal date would be December 31. Testimony from Martin also establishes an understanding that Bendalin was to remain with the company until December 31.

It is uncontradicted that the initial notification specified a withdrawal date of December 31. Under TRPA Section 6.01, the date of withdrawal was December 31, 2008. This point of error is sustained.

### 5. Bendalin's Withdrawal Was Not Wrongful

TRPA Section 6.02, entitled "Wrongful Withdrawal," states:

(a) Power to Withdraw. A partner at any time before the occurrence of an event requiring a winding up has the power to withdraw from the partnership and cease to be a partner as provided by Section 6.01.
(b) Wrongful Withdrawal. A partner's withdrawal is wrongful only if:
(1) it is in breach of an express provision of the partnership agreement;
(2) in the case of a partnership for a definite term or particular undertaking or for which the partnership agreement provides for winding up on a specified event,

31

before the expiration of the term, the completion of the undertaking, or the occurrence of the event:

    (A)    the partner withdraws by express will.

TEX. REV. CIV. STAT. ANN. art. 6132b-6.02. The trial court found that Bendalin's failure to fulfill a ten-year service commitment was an express breach of the Agreement under Section 6.02(b)(1), and a violation of Section 6.02(b)(2) because "[t]he term of the Partnership was definite, 'until dissolved in accordance with the terms of Section 5.1.'"

First, we address the trial court's finding that Bendalin's withdrawal from YB Partnership before "the expiration of the definite term," and before the "occurrence of any of the events specified in Agreement § 5.1 as requiring a winding up of YB" made "Bendalin's withdrawal 'wrongful.'" Under the heading "term," the Agreement states that the "Partnership shall commence on the Effective Date and shall continue until dissolved in accordance with the terms of <u>Section 5.1</u>." Section 5.1 lists bankruptcy and unanimous consent of all partners as the two events requiring dissolution.[31] Section 5.1 specified events which may never have occurred. Contrary to the court's understanding, because the term of YB Partnership was measured by events of indefinite occurrence, the term was, thus, indefinite.

The YB Agreement is silent as to any specific duration, and nothing suggests that it was created to last only for a specific period of time. The YB Agreement also does not list any particular purpose or specified event, the occurrence of which would signify an event requiring winding up of the partnership. TEX. REV. CIV. STAT. ANN. art. 6132b-8.01. Therefore, because

---

[31]TRPA "replace[d] the phrase 'dissolution' with the phrase 'event requiring winding up' in an attempt to eliminate much of the confusion that existed under the" Texas Uniform Partnership Act. TEX. REV. CIV. STAT. ANN. art. 6132b-7.01, cmt.

YB Partnership was not for a definite term and was not created for a particular undertaking or specified event which would require a winding up on occurrence, Bendalin's withdrawal could not be seen as occurring "before the expiration of the term, the completion of the undertaking, or the occurrence of the event," and TRPA Section 6.02(b)(2) could not apply. TEX. REV. CIV. STAT. ANN. art. 6132b-6.02.

Therefore, we must look to the YB Agreement to determine whether Bendalin's withdrawal constituted a breach of the agreement. YB Partnership argues that the YB Agreement required Bendalin's service for a period of ten years. Bendalin argues that the ten-year time frame specified in the agreement merely entitled him to certain rights and bonuses if he were to have served the partnership for at least ten years.

In reviewing the agreement, we will interpret the terms of the contract based on "the plain, ordinary and generally accepted meaning attributed to the term or word." *In re Green Tree Servicing LLC*, 275 S.W.3d 592, 598 (Tex. App.—Texarkana 2008, no pet.) (quoting *Pratt–Shaw v. Pilgrim's Pride Corp.*, 122 S.W.3d 825, 833 (Tex. App.—Dallas 2003, pet. denied)). If a written instrument's text can be given a definite legal meaning, the contract is not ambiguous and must be construed as a matter of law. *Holland v. Holland*, 357 S.W.3d 192, 195–96 (Tex. App.—Dallas 2012, no pet.); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). If the language of a contract is subject to two or more reasonable interpretations, it is ambiguous. *Holland*, 357 S.W.3d at 196; *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517 (Tex. 1995). Neither party argues the contract is ambiguous.

33

"The intent of the parties must be taken from the agreement itself, not from the parties' present interpretation, and the agreement must be enforced as it is written." *Pegasus Energy Group v. Cheyenne Petroleum Co.*, 3 S.W.3d 112, 121 (Tex. App.—Corpus Christi 1999, pet. denied) (citing *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 731–32 (Tex. 1981)); *Holland*, 357 S.W.3d at 195–96. "An unambiguous contract will be enforced as written and parol evidence[32] will not be received for the purpose of creating an ambiguity." *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011).

Article III of the Agreement is the source of YB Partnership's argument that withdrawal prior to ten years of service by Bendalin was not contemplated, and a careful examination of that article is critical to an understanding of this issue. The article is titled "Financial Arrangements and Services." Section 3.2 of the article addresses capital reserve funds, and sets up a reserve fund for Bendalin. Under subsection (b) of Section 3.2, entitled "Bendalin Reserve Paid to Bendalin on Death, Incapacity or Fulfillment of Bendalin Commitment," circumstances under

---

[32]The following is a transcript from Bendalin's testimony:

Q. . . . Were you a party to a Youngblood & Bendalin Partnership Agreement?
A. Yes.
Q. Did you have a ten-year service commitment under that agreement?
A. No.
Q. Does the provision of the YB Partnership Agreement called Service Commitment -- Bendalin Service Commitment?
A. Yes, sir.
Q. And it's ten years?
A. There is a ten-year -- there is -- Yes.
Q. And you're that Bendalin.
A. Yes, I am.
Q. And you left the YB Partnership without fulfilling a ten-year Bendalin Service Commitment, true?
A. That's true.

which Bendalin can receive the sums in his reserve fund are described. The subsection specifies that "[t]he balance in the Bendalin Reserve will be paid to Bendalin at the fulfillment of the Bendalin Service Commitment." If "Bendalin should voluntarily cease performing Normal Services to the Partnership before the fulfillment of the Bendalin Service Commitment," he forfeits his right to reserve funds. While the definition of Service Commitment in the general definition section fails to contain a time frame for service, subsection (b) of 3.2 states that "[a]s used in this paragraph the 'Bendalin Service Commitment' is the commitment of Bendalin to provide his Normal Services for the Partnership for at least the next ten (10) consecutive years."

A plain reading of this Agreement demonstrates that the ten-year service commitment time frame in subsection (b) is limited to that reserve fund paragraph by its express terms. Because there is no other term in the Agreement stating that Bendalin is required to be a partner and perform normal services for a specified time frame, Bendalin's right to withdraw is not otherwise restricted.

YB Partnership acknowledges that, while the ten-year time period is not mentioned elsewhere in the YB Agreement, certain provisions reference Youngblood's and Bendalin's respective service commitment. Under Article V, entitled "Dissolution, Withdrawal and Emeritus Status," in a section labeled "Buy-Out on Death, Incapacity or Retirement of Bendalin or Youngblood," the Agreement stated:

> At such time as the first of Bendalin or Youngblood should voluntarily withdraw from performing services for the Partnership after the fulfillment of his respective Service Commitment . . . his partnership interest will be purchased by the other for a price . . . equal to 125% of the average annual Net Profits for the Partnership during the Base Period, payable in five equal annual installments on January 15 of

35

the year following the event giving rise to such right and obligation to purchase and on January 15 of each consecutive calendar year thereafter (the "Buy-Out Arrangement").

Section 5.4 also states that:

> At any time after the expiration of his respective Service Commitment, Youngblood and Bendalin may elect Emeritus Status. . . . If such an election is made, such electing Partner will thereafter be entitled to receive a percentage share of Available Distributions only in accordance with the percentage reduction in Normal Services he designates in such notice that is less than the Pro Rata Share . . ., but he will not be entitled to invoke a Buy-Out-Agreement unless and until he permanently withdraws from the Partnership.

Neither Article V nor the definition of service commitment specifies a time frame for performing services, and we need not determine what the phrase "respective Service Commitment" means in this case. In any event, the only effect of Bendalin's completion of the Service Commitment is the power to invoke his rights to the reserve fund, the buy-out, or the emeritus status election. They appear to be a reward offered to Bendalin should he complete the Service Commitment. Nothing in the YB Agreement obligates Bendalin to provide normal services or remain a partner for a period of ten years or be subject to a wrongful withdrawal.

In interpreting the YB Agreement as a whole according to its plain terms, we find that the trial court erred in determining that Bendalin's withdrawal before completing a ten-year term was wrongful. This point of error is sustained.

*6.      Remand Is Needed to Determine the Amounts to be Recovered*

TRPA Section 7.01 provides:

(b)      Redemption Price. (1) The redemption price of the withdrawn partner's partnership interest is the fair value of the interest as of the date of withdrawal, except that the redemption price of the partnership interest of a partner who wrongfully withdraws before the expiration of a definite term, the completion of a particular undertaking, or the occurrence of a specified event requiring a winding up is the lesser of:

> (A)      the fair value of the withdrawn partner's partnership interest as of the date of withdrawal; or

> (B)      the amount that the withdrawn partner would have received if an event requiring a winding up had occurred at the time of the partner's withdrawal.

(2)      Interest is payable on the amount owned under this subsection.

(c)      Contributions from Wrongfully Withdrawing Partner.  If a wrongfully withdrawing partner would have been liable to make contributions to the partnership under Section 8.06(b) or (c) if an event requiring winding up had occurred at the time of the withdrawal, the withdrawn partner is liable to the partnership to make contributions in that amount to the partnership, plus interest on the amount owed.

TEX. REV. CIV. STAT. ANN. art. 6132b-7.01.  Because it was error to determine that Bendalin wrongfully withdrew as of December 2, 2008, the calculation of Bendalin's redemption value was inappropriate.  We reverse the damage assessment and remand the matter to the trial court to determine the fair value of Bendalin's interest as of December 31, 2008, in accordance with Section 7.01.[33]

Bendalin raised points of error relating to the court's award of expert and attorney's fees. Expert fees are generally not recoverable.  *Pilgrim's Pride Corp. v. Burnett*, No. 12-10-00037-

---

[33]Due to our disposition, we decline to address issues raised in YB Partnership's cross-appeal.

CV, 2012 WL 381714, at *16 (Tex. App.—Tyler Feb. 3, 2012, no pet.) (mem. op). The trial court cited Section 7.01(1) as a mechanism by which it awarded expert fees. This section, entitled "Action to Determine Redemption Terms," states that:

> If the court finds that a party acted arbitrarily, vexatiously, or not in good faith, including the failure to tender payment or make an offer to pay or to comply with the requirements of Subsection (i), the court may access damages against the party, including if appropriate a share of the profits of the continuing business, reasonable attorney's fees, and the fees and expenses of appraisers or other experts for a party to the action, in amounts the court finds equitable.

TEX. REV. CIV. STAT. ANN. art. 6132b-7.01(l). The findings of fact state in a conclusory manner that "Bendalin acted arbitrarily, vexatiously or not in good faith in this cause." The findings do not state the basis for the trial court's conclusion, although they caution that "in making this finding, the Court did not rely on any reference by Plaintiff in this cause to Bendalin's rejection of a mediator's proposal."

> With respect to attorney's fees, the court's findings of fact state:

> Both Plaintiff and Defendant sought a declaratory judgment on whether Bendalin wrongfully withdrew from the YB Partnership and both parties invoked the equitable discretion of the Court under Texas Civil Practice and Remedies Code . . . to award attorney's fees as may be equitable and just . . . Plaintiff also alleged breach of contract and sought an award of attorney's fees.

We have concluded that Bendalin's withdrawal from YB Partnership was not wrongful. We are left to ponder whether the expert fees were awarded due to the court's finding of wrongful withdrawal. Here, given that our reversal of the judgment may change the basis on which the trial court awarded sums for attorney's fees and expert fees, we remand these other awards to the trial court for its reconsideration. *See Shows v. Man Engines & Components, Inc.*,

38

364 S.W.3d 348, 359 (Tex. App.—Houston [14th Dist.] 2012, no pet h.); *Thompson v. Clayton*, 346 S.W.3d 650, 657 (Tex. App.—El Paso 2009, no pet.); *Moore v. Jet Stream Invs., Ltd.*, 261 S.W.3d 412, 432 (Tex. App.—Texarkana 2008, pet. denied).

Josh R. Morriss, III
Chief Justice

Date Submitted:     August 9, 2012
Date Decided:       October 2, 2012