

# NUMBER 13-21-00077-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

| | |
|---|---|
| **HASSAN M. TORK,** | **Appellant,** |
| **v.** | |
| **RAY A. AND CARMEN B. GARCIA,** | **Appellees.** |

### On appeal from the 135th District Court of Calhoun County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Silva and Peña
Memorandum Opinion by Justice Peña**

Appellant Hassan M. Tork appeals a take-nothing judgment, following a bench trial,

on his breach of contract claim. By ten issues which we interpret as two, Tork argues that:

(1) the evidence was legally and factually insufficient to support the trial court's judgment;

and (2) the trial court abused its discretion in failing to issue findings of fact regarding Tork's attorney's fees. We affirm.

## I. BACKGROUND

### A. The Underlying Facts[1]

Tork owned and operated several Skillet's Restaurants in South Texas, including one in Port Lavaca and another in Victoria. In 2015, Tork closed his Port Lavaca location and placed the building for sale. A realtor introduced appellees Ray and Carmen Garcia to Tork in 2016. Ray stated that he and his wife were interested in purchasing the Port Lavaca restaurant but could not afford the purchase price of $700,000. Because the restaurant's lack of revenue for two years prevented the Garcias from obtaining a bank loan, the parties negotiated a year-long lease with an option to buy the restaurant for $599,000. The parties executed this lease on July 16, 2016.

Carmen testified that the Garcias spent thousands of dollars of their own money repairing the Port Lavaca restaurant during the lease term. According to her, the most significant expenses were for air conditioning and freezer repairs, upgrades to the vent hood and frying equipment, and the purchase of a new ice machine. By April of 2017, the Garcias signed a commercial contract with Tork to purchase the property for $592,747, contingent on the Garcias securing financing.[2] The contract set a closing date of July 1, 2017.

---

[1] These facts are taken from the trial evidence.

[2] The record shows that Tork gave the Garcias credit for the repairs they had made to the restaurant during the pendency of their lease.

2

The Garcias amassed $121,000 as a down payment toward the purchase of the restaurant by selling their residence and personal stock. However, they were unable to secure a loan for the remainder of the purchase price by July 1. Tork subsequently agreed to extend the closing deadline in exchange for a separate promissory note of $18,000,[3] and the closing date was moved to August 25, 2017. The Garcias finally obtained financing from Woodforest National Bank and were prepared to close on August 25. Unfortunately, Hurricane Harvey then ravaged Port Lavaca in late August of 2017, and the closing did not occur at this time, either. Because of the hurricane, the parties mutually agreed to move the closing date to September 20, 2017.

Under the terms of the commercial contract, Tork could have taken the $6,000 in earnest money the Garcias had tendered to the title company and terminated the agreement. The commercial contract specifically set forth that, "[i]f Buyer fails to comply with this contract, Buyer is in default and Seller, as Seller's sole remedy(ies), may terminate this contract and receive the earnest money [] as liquidated damages for Buyer's failure." Tork did not exercise this remedy, however, and the Garcias continued to operate the Port Lavaca restaurant on a month-to-month basis.

Tork gave conflicting testimony regarding whether the contract to sell the Port Lavaca ever terminated. At his deposition, he was asked, "When did you terminate [the contract to sell]?", to which he replied, "I did not." At trial, however, he stated "as far as [he] was concerned . . . the contract was over" in July of 2017. Tork's commercial realtor

---

[3] Carmen testified that Tork lost $18,000 on a missed vacation and other business expenses related to the sale not occurring, so he asked the Garcias to pay that amount in exchange for continuing with the sale of the Port Lavaca restaurant.

3

James Paxton, however, testified that Tork never took the Garcia's $6,000 earnest money as liquidated damages to terminate the contract. Paxton also stated that he never drafted a termination contract for the sale of the Port Lavaca restaurant.

Tork testified that he received "numerous offers" on the Port Lavaca restaurant. One call in particular was from someone who offered to purchase the Port Lavaca restaurant for $800,000. Tork testified that he could not recall the name of the person who made this offer, nor did he obtain an email address or phone number from this person. According to Carmen, one week before the September closing date, Tork told the Garcias about this new offer. In response, Tork made the Garcias a new offer of $100,000 to walk away from the purchase contract.

The Garcias, however, did not want to do this. Carmen testified that she spent a year of her life "building up" the restaurant through personal sacrifice, including selling her home and living in an RV with her husband, quitting her job, and selling personal stock. She also claimed she injured herself once while cleaning the Port Lavaca restaurant, spending some time in the hospital. In sum, she stated that she "spent too much money and time in this thing."

According to Carmen, Tork then made another offer: he would add $100,000 to the purchase price which would go toward the optional purchase of his Victoria Skillet's Restaurant. On the day of closing, Tork presented a letter to the Garcias that stated the following:

This letter is to serve as the agreement between [the parties], as follows:

1. That the total purchase price to be paid by [Ray] and [Carmen] for the Port Lavaca Property at the Closing is the sum of $592,747[], including

4

third party financing secured by a vendor's lien and first lien deed of trust on the Port Lavaca Property.

2. That, in consideration of [Tork] closing the sale of the Port Lavaca Property, [Ray] and [Carmen] agree, promptly after closing, to execute a promissory note in the amount of $100,000[], payable to [Tork] for a term of 18 months. The $100,000[] note will be secured by a second lien deed of trust on the Port Lavaca Property which will be inferior to the first lien deed of trust executed by [Ray] and [Carmen] in connection with the purchase of the Port Lavaca Property. The form and terms of the $100,000[] note and the second lien deed of trust securing the $100,000[] note will be subject to agreement between [Tork] and [Ray] and [Carmen], but will be in accordance with appropriate forms contained in the State Bar of Texas Real Estate Forms Manual.

[Ray] and [Carmen]'s agreement to execute the $100,000[] note and the second lien deed of trust securing the note, is subject to [Tork's] agreement to grant to [Ray] and [Carmen] an option to purchase the land and building located at 3202 Houston Highway, Victoria, Texas (the "Victoria Skillet['s]"), for the purchase price of $750,000[] (said purchase price of $750,000[])[,] specifically for the land and building and not the business located at the Victoria Skillet['s]) for a period of 18 months from the date of the $100,000[] note, and, [Tork's] further agreement that, in the event of the closing of the sale of the Victoria Skillet['s] from [Tork] to [Ray] and [Carmen] within 18 months from the date of the $100,000[] note, [Tork] will promptly cancel any balance remaining on the $100,000[] note and release the second lien deed of trust securing the $100,000[] note.

Notwithstanding anything contained in this letter agreement to the contrary, [Tork] expressly retains the right to sell the Victoria Skillet['s] to any party and at any price or terms during the 18 month period, after the date of the $100,000[] note. Further, in the event of the sale of the Victoria Skillet['s] to another party during the 18 month period after the date of the note, the balance of the $100,000[] note will remain payable in full according to its terms.

Carmen testified that she and Ray signed that letter. However, she stated that Tork then drew a line through the "5" in the "$592,747" amount in the letter and wrote in a "6", to make the total purchase price $692,747. Carmen explained:

[W]hen we finish signing it[, Tork] says, ["H]old on. This is supposed to be

5

a six["] and [Tork] changes that five to a six. I'm like why are you changing that to a six, are we not buying the store for [$]600,000 and Ray is like, no, that's just that [$]100,000 if we don't buy the Victoria store that [$]100,000 is for that Victoria store, so I was like, are you sure, and we looked at the paper, the closing papers, and that said [$]592 so that kind of made me feel at ease. Okay, it's at [$]592. This one said [$]692. He changed that five to a six but the other papers say [$]592, so I just went with what Ray said, no, that's that [$]100,000 from Victoria store if we don't buy it. That's why he's adding that [$]100,000.

Carmen testified, "This agreement, to me, was for that Victoria store. It didn't have anything to do with the Port Lavaca store." The Garcias then both initialed the changed number that reflected "$692,747." Of note, the actual purchase contract, entitled "Commercial Contract – Improved Property," still reflected the $592,747 purchase price.

Ray further testified about the circumstances regarding signing and initialing that letter:

Well, well, you want to talk about two individuals that threw their hat over the fence, I mean, we sold the house. We're living in an RV. My wife is no longer working at a place that she was established at working. And if we lose the business, man, I can't imagine. I don't think people can imagine that kind of pressure you are, I was under from both sides—from my wife and from [Tork] and trying to get that thing, you know, get this thing done, so when we signed it, we signed everything. Like I said, I thought it was for the [$]592[,000] or whatever it is, and when he scratched that out and put—I, in my mind I thought we were done with the Port Lavaca and this was part of something with the Victoria. That's—and Carmen even said, bless her heart, she said, well, why are we changing that price? What is it for? And I told her it was for the Victoria store. I didn't know that it was for this other place.

The sale of the Port Lavaca restaurant closed on September 20, 2017. However, the Garcias did not execute the $100,000 promissory note, nor did they purchase the Victoria restaurant location. Although Ray apparently made attempts to get a loan for the purchase, he testified that Tork never sent him information the bank required to justify a

6

loan. Further, Tork admitted that he did not grant the Garcias an option to purchase the land and building for the Victoria restaurant.

## B.    The Litigation

Tork eventually sued the Garcias for breach of contract when they failed to purchase the Victoria restaurant or execute the $100,000 promissory note. His original petition claimed that the letter agreement, signed and initialed by the Garcias at the closing on September 20, 2017, explains their contractual obligation to pay him the additional amount for the Port Lavaca restaurant. Carmen filed a general denial, but also asserted affirmative defenses of lack of consideration, estoppel, and duress. Ray, appearing pro se, filed a separate answer containing only a general denial.

The trial court held a bench trial on December 1, 2020. On December 17, 2020, the trial court issued a take-nothing judgment against Tork. On January 21, 2021, the trial court issued the following findings of fact and conclusions of law:

Findings of Fact:

1.    The Commercial Contract – Improved Property marked as [Tork's] Exhibit 4 was never terminated. The parties thereto simply agreed to extend closing date contained in the contract out to September 20, 2017. The purchase price in said contract was $592,747[].

2.    [Tork's] Exhibit 5 was signed by all parties prior to the scratched out change of the purchase price from $592,747[] to $692.747[] as contained in section 1. [Tork's] Exhibit 5 represented an affirmation of the purchase price contained in Commercial Contract – Improved Property marked as [Tork's] Exhibit 4.

3.    [Tork] never granted [Carmen] or [Ray] an option to purchase the land and building located at 3202 Houston Highway, Victoria, Texas (the "Victoria Skillet's") for the purchase price of $750,000[] for a period of 18 months.

4.   The parties closed on the Commercial Contract – Improved Property marked as [Tork's] Exhibit 4 on September 20, 2017. The contract sales price was $599,000[] as reflected in [Tork's] Exhibit 6.

5.   The Court finds that no money is now due or owing to [Tork] from [the Garcias].

Conclusions of Law:

1.   The Court finds that there was no consideration for the proposed increase in the purchase price from $592,747[] to $692,474[] [sic] as reflected in [Tork's] Exhibit 5.

2.   The Court finds that [the Garcias were] never legally obligated to execute a $100,000[] [sic] in favor of [Tork].

3.   The Court finds that [Tork] represented to [the Garcias], and contractually agreed, that the purchase price for the Port Lavaca Skillet's [sic] was $592,747[], and [the Garcias] relied on that representation and acted to [their] detriment on said reliance.

4.   The Court finds that [Tork] is estopped from raising the cont[r]act price from $592,747[] to $692,747[].

5.   The Court finds that [Tork] is not entitled to a recovery from [the Garcias] in this suit under any theory and shall take nothing on his claims.

Tork filed a motion for new trial and judgment. Tork also requested additional findings of fact and conclusions of law, requesting the court to make findings for the reasonable value of his attorney fees through trial and appeal to this Court and the Texas Supreme Court. The trial court did not make these requested additional findings, and the motion for new trial was overruled by operation of law.

Tork appeals.[4]

---

[4] Ray and Carmen have since divorced. Only Carmen, through her attorney, filed a responsive brief on appeal.

## II.    SUFFICIENCY OF THE EVIDENCE

By what we construe as his first issue, Tork contends the evidence adduced at trial was insufficient to support the trial court's findings of fact, conclusions of law, and judgment.

## A.    Standard of Review

"In a legal sufficiency challenge, we consider whether the evidence at trial would enable a reasonable and fair-minded fact finder to reach the verdict under review." *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). "When a party attacks the legal sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001).

"Evidence is legally insufficient to support a . . . finding when[:] (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact." *Gunn*, 554 S.W.3d at 658 (first citing *Bustamante v. Ponte*, 529 S.W.3d 447, 455–56 (Tex. 2017); and then citing *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003)). More than a mere scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.* (citing *King Ranch, Inc.*, 118 S.W.3d at 751). Conversely, less than a scintilla of evidence exists when the

9

evidence offered to prove a vital fact's existence is "so weak as to do no more than create a mere surmise or suspicion." *Id.* All the record evidence must be considered in the light most favorable to the verdict—"every reasonable inference deducible from the evidence is to be indulged in that party's favor." *Id.* (citing *Bustamante*, 529 S.W.3d at 456).

By contrast, a factual sufficiency review is premised on consideration of the entire record. *In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020). "The assumption that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so remains." *Id.* Rather than disregarding disputed evidence that a reasonable factfinder could not have credited in favor of the finding, though, the court must determine whether, in light of the entire record, that evidence "is so significant that a factfinder could not reasonably have formed a firm belief or conviction" that the finding was true. *Id.*

The standard of review for factual and legal sufficiency challenges remains the same regardless of whether a judge or a jury served as the factfinder. *Victory Energy Corp. v. Oz Gas Corp.*, 461 S.W.3d 159, 170 (Tex. App.—El Paso 2014, pet. denied) (citing *Raman Chandler Props., L.C. v. Caldwell's Creek Homeowners Ass'n, Inc.*, 178 S.W.3d 384, 390 (Tex. App.—Fort Worth 2005, pet. denied)). Further, because the factfinder is the sole judge of a witness's credibility and demeanor, we must defer to its factual determinations. *See City of Keller*, 168 S.W.3d at 827. "We 'assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so,' and we 'disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.'" *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *see*

10

*also Cox v. Walden*, No. 13-20-00283-CV, 2022 WL 120014, at *3 (Tex. App.—Corpus Christi–Edinburg Jan. 13, 2022, no pet.) (mem. op.).

## B.    Findings of Fact

We will address each of the contested fact findings in turn. First, the trial court found that the commercial contract was never terminated. The "Commercial Contract – Improved Property," which all the parties signed, set forth a specific provision regarding termination. Counsel for Carmen cross-examined Tork on this provision during trial:

> Counsel:    All right. Now, I'll read it: If buyer fails to comply with this contract, buyer is in default and seller, as seller's sole remedy may[ ] terminate this contract and receive the earnest money as liquidated damages for buyers' failure. But that never happened, did it?
>
> Tork:    May I explain?
>
> Counsel:    I'm asking you did that happen?
>
> Tork:    No, sir. . . .

This testimony supports the trial court's finding that an agreement to sell the Port Lavaca restaurant existed and never terminated. Paxton, Tork's realtor, also confirmed that he never drew up a termination contract. Carmen's testimony further buttresses this finding. Carmen testified that she and Ray were unable to close on the original closing date of July 1, 2017 because they did not have funding. Accordingly, they executed an $18,000 promissory note to extend the closing deadline to August 25, 2017. The Garcias then secured a commercial loan from Woodforest Bank to enable the parties to proceed with the August 25 closing date. However, Hurricane Harvey then struck. Trial testimony established that because several areas of Port Lavaca did not have water or electricity in

11

the aftermath of the storm, the parties mutually agreed to close on September 20, 2017. The agreement to sell existed.

The existence of the agreement is further supported by Tork's own admission that he offered the Garcias' $100,000 to "get out" of the existing agreement to sell. Tork would not have to make a new offer to the Garcias had he not already been bound by the existing agreement to sell. *See, e.g.*, *McKinney v. Flato Bros., Inc.*, 397 S.W.2d 525, 529 (Tex. App.—Corpus Christi–Edinburg 1965, no writ) (holding that the necessary elements to plead novation are (1) a previous valid obligation; (2) the *agreement* of all the parties to a new contract; (3) the *extinguishment* of the old contract; and (4) the validity of the new one) (emphasis added)).

Second, the trial court found that Plaintiff's Exhibit 5, the letter agreement Tork brought to the closing, was signed by all parties prior to the scratched-out change of the purchase price from $592,747 to $692.747. Both Carmen and Ray testified that they signed the letter first, then Tork scratched out the "5" on the "$592,747" amount and had them initial the change. Prior to Tork's changing of the number, there is no dispute that the letter and the purchase contract entitled "Commercial Contract – Improved Property" both reflected that the purchase price of the Port Lavaca restaurant was $592,747. Although Tork testified otherwise, the trial court was the sole factfinder and chose to believe the Garcias' version of the facts over Tork's. *See City of Keller,* 168 S.W.3d at 827. Because the trial record supports this fact finding, we do not disturb it. *See id.*

Third, the trial court found that Tork never formally granted the Garcias an option to purchase the land and building located at 3202 Houston Highway in Victoria, Texas for

12

the purchase price of $750,000 for a period of eighteen months. Tork admitted as much during cross examination:

Counsel: And you never made a written agreement to grant them that option, did you?

Tork: No, sir.

The Garcias testified that they believed the $100,000 promissory note was contingent upon Tork extending an offer to purchase the Victoria restaurant. Tork, on the other hand, argues that the $100,000 was for the Port Lavaca restaurant sale. However, viewing the record in light of the verdict, the parties had *already* agreed to extend to the closing date from August 25, 2017 to September 20, 2017 due to Hurricane Harvey. "Mutual promissory obligations by the parties to the agreement furnishes sufficient consideration to constitute a binding contract." *Domingo v. Mitchell*, 257 S.W.3d 34, 40 (Tex. App.—Amarillo 2008, pet. denied) (citing *Iacono v. Lyons*, 16 S.W.3d 92, 94 (Tex. App.—Houston [1st Dist.] 2000, no pet.)). Here, because the parties had mutually agreed to extend the closing date due to an act of God, the revised letter agreement could not have constituted "consideration" for a promise Tork had previously made to close on September 20, 2017.

In sum, the Court found that the contract for the Port Lavaca Property was never terminated, that the sales price was $592,747, and that the Garcias did not owe any additional money to Tork. Considering the trial court's findings in the light most favorable to the verdict and indulging every reasonable inference deducible from the evidence in the Garcias' favor, we hold that the trial court's foregoing findings of fact are supported by the record. *See Dow Chem. Co.*, 46 S.W.3d at 241. A "reasonable and fair-minded

13

fact[ ]finder" could have reached this verdict. *Gunn*, 554 S.W.3d at 658. And in light of the entire record, a factfinder could have reasonably formed a firm belief or conviction that these findings were true. *Stoddard*, 619 S.W.3d at 674.

## C. Conclusions of Law

Tork's brief further argued that "each of the [c]onclusions of law presented by the trial court are not supported by the evidence, but instead are contrary to the undisputed and great weight and preponderance of the evidence."

Appellate courts must review a trial court's conclusions of law as legal questions. *I & JC Corp. v. Helen of Troy L.P.*, 164 S.W.3d 877, 883 (Tex. App.—El Paso 2005, pet. denied) (citing *Hitzelberger v. Samedan Oil Corp.*, 948 S.W.2d 497, 503 (Tex. App.—Waco 1997, pet. denied)). "The appellant may not challenge a trial court's conclusions of law for factual insufficiency; however, the reviewing court may review the trial court's legal conclusions drawn from the facts to determine their correctness." *Id.* (first citing *Templeton v. Dreiss,* 961 S.W.2d 645, 656 n.8 (Tex. App.—San Antonio 1998, pet. denied); and then citing *Dallas County v. Sweitzer*, 881 S.W.2d 757, 763 (Tex. App.—Dallas 1994, writ denied)).

The trial court first concluded that there was no consideration for the proposed increase in the purchase price from $592,747 to $692,747. A modification to a contract must still satisfy all the elements required for a contract: a meeting of the minds supported by consideration. *Barrand, Inc. v. Whataburger, Inc.*, 214 S.W.3d 122, 145 (Tex. App.—Corpus Christi–Edinburg 2006, pet. denied) (citing *Hathaway v. General Mills, Inc.*, 711 S.W.2d 227, 228–29 (Tex. 1986)). "Consideration is a bargained-for exchange of

14

promises or return performance and consists of benefits and detriments to the contracting parties." *Marx v. FDP, LP*, 474 S.W.3d 368, 378 (Tex. App.—San Antonio 2015, pet. denied). Here, Tork contends that the consideration of the $100,000 was for him to *continue* with the sale of the Port Lavaca restaurant to the Garcias and not his new alleged offeror. However, the trial court found—and the record supported—that the "Commercial Contract – Improved Property" was never terminated. Accordingly, the original contract to sell the Port Lavaca restaurant for $595,747 was still in place—no new consideration was necessary.

We also note that the trial court could have found from the evidence that there was no "meeting of the minds" with respect to the letter agreement. "'Meeting of the minds' describes the mutual understanding and assent to the agreement regarding the subject matter and the essential terms of the contract." *Potcinske v. McDonald Prop. Invs., Ltd.*, 245 S.W.3d 526, 530 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (quoting *Weynand v. Weynand*, 990 S.W.2d 843, 846 (Tex. App.—Dallas 1999, pet. denied)). Here, the record revealed no mutual understanding of the letter as both Tork and the Garcias had differing testimony regarding its significance and what the $100,000 amount was for. *See id.* Accordingly, we conclude no consideration existed for the modification.[5]

C.    **Conclusion**

In light of the record, we conclude the take-nothing judgment is supported by

---

[5] We need not address the remaining conclusions of law, as we can uphold the judgment under this legal theory which is supported by the evidence. *See* TEX. R. APP. P. 47.1; *Bendalin v. Youngblood*, 381 S.W.3d 719, 735 (Tex. App.—Texarkana 2012, pet. denied) (citing *City of Houston v. Cotton*, 171 S.W.3d 541, 546 (Tex. App.—Houston [14th Dist.] 2005, pet. denied)). Assuming without deciding that the remaining conclusions of law are incorrect, the judgment "do[es] not require reversal if the controlling findings of fact support the judgment under a correct legal theory." *Id.*

15

legally and factually sufficient evidence, and that the trial court's legal conclusions based on the record were correct. *See I & JC Corp.*, 164 S.W.3d at 883. As an appellate court, we must defer to the trial court's factual determinations of witness credibility and demeanor. *See City of Keller,* 168 S.W.3d at 827. Although Tork and the Garcias had conflicting recollections regarding the letter agreement and the significance of the $100,000 promise, it appears the trial court believed the Garcias' testimony regarding the events. The evidence at trial would enable a reasonable and fair-minded factfinder to reach this verdict under review. *See Gunn*, 554 S.W.3d at 658; *City of Keller*, 168 S.W.3d at 827. And reviewing the record as a whole, the evidence was sufficient such that a factfinder could have reasonably formed a firm belief or conviction that the parties had a contract to purchase the Port Lavaca restaurant for $592,747, that the subsequent amendment offered no additional consideration, and that Tork is equitably estopped from enforcing the amendment. *See Stoddard*, 619 S.W.3d at 674. Accordingly, we overrule Tork's first issue.

### III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

By his second issue, Tork complains that the trial court erred by failing to issue findings of fact and conclusions of law regarding his attorney's fees.

A party to a bench trial is entitled to request findings of fact and conclusions of law from the district court. *See* TEX. R. CIV. P. 296. "The district court has a mandatory duty to respond to a timely request to file findings of fact and conclusions of law, and a failure to do so is error." *Hernandez v. Moss*, 538 S.W.3d 160, 164–65 (Tex. App.—El Paso 2017, no pet.) (citing *Cherne Indus., Inc. v. Magallanes*, 763 S.W.2d 768, 772 (Tex. 1989);

16

and then citing *Larry F. Smith, Inc. v. The Weber Co.*, 110 S.W.3d 611, 614 (Tex. App.—Dallas 2003, pet. denied)). "[E]rror is presumed harmful unless the record affirmatively shows that the complaining party suffered no harm from the district court's failure." *Id.*

To secure an award of attorney's fees, a prevailing party must prove that: "(1) recovery of attorney's fees is legally authorized, and (2) the requested attorney's fees are reasonable and necessary for the legal representation, so that such an award will compensate the prevailing party generally for its losses resulting from the litigation process." *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 487 (Tex. 2019); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (allowing recovery of attorney's fees in contractual claims).

Here, however, because we previously concluded that the trial court's take-nothing judgment against Tork was supported by legally and factually sufficient evidence, Tork was not the prevailing party. Therefore, Tork was not entitled to attorney's fees. *See id.* Accordingly, Tork suffered no harm from the trial court's failure to issue these findings. *See Hernandez*, 538 S.W.3d at 165. We overrule this issue.

## IV. CONCLUSION

We affirm the trial court's judgment.

L. ARON PEÑA JR.
Justice

Delivered and filed on the
30th day of March, 2023.

17